## Powell, et al. v. Ward, et al.

(Decided February 9, 1926.)

### Appeal from Pike Circuit Court.

1. Mines and Minerals—Lessor of Coal Land Held Entitled, Under Contract, Not Only to One-Half of Royalty, but of One-Half Net Profits on Coal Mines.—Contract whereby owners leased one-half

interest in coal mine, lessee to pay 5 cents per ton royalty for coal sold for more than $3.00 per ton, and reserving to lessee right to sell and collect for all coal mined and to have one-half of net profit, held a joint lease, under which lessors were entitled, not only to one-half of royalty, but one-half of net profits of coal mined.

2.  Mines and Minerals—Construction Placed on Ambiguous Lease Contract by Parties Held Controlling.—Admitting that lease contract for mining of coal was ambiguous, construction placed on it by parties thereto prior to suit held controlling.

3.  Mines and Minerals—Contract Held Unilateral and Unenforceable Except as Executed.—Contract leasing half interest in coal mine, under which lessee was to pay royalty for coal sold for more than $3.00 a ton, he to have right to operate mine so long as he could make profit on coal, and right to turn it back to lessors on notice, held unilateral and unenforceable by him, except as already executed.

ROSCOE VANOVER for appellants.

DAUGHERTY & BARRETT for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE CLARKE—
Affirming.

James Powell and Staley Simpson jointly owned the tract of land here involved and prior to May 1, 1922, operated a coal mine thereon. On that date they entered into the following contract with J. B. Ramey:

"The contract, made and entered into between James Powell and Staley Simpson, owners of a certain coal mine, parties of the first party and J. B. Ramey, party of the second part,

"WITNESSETH: That for and in the conditions and stipulations hereinafter mentioned in this contract, the said James Powell and Staley Simpson have leased to J. B. Ramey a one-half interest in their said coal mine and said J. B. Ramey is to pay said Powell and Simpson five cents per ton royalty for coal mined out of said mine so long as he is selling coal on the market for more than three dollars per ton, and said J. B. Ramey is not to pay any royalty unless he is getting more than three dollars per ton for coal sold on the market. Said J. B. Ramey is to have the right and privilege to operate said mine so long as he can make a profit on said coal, but reserves the right to turn the said mine back to said Powell and Simpson at any time, giving them

five days' notice, which shall terminate the life of this contract.

"Said J. B. Ramey reserves the right to sell and collect for all coal mined and is to have one-half of the net profit for all coal which is sold from said mine.

"In witness whereof we have this first day of May, 1922, placed our signatures.

"JAMES POWELL,<br>S. SIMPSON.<br>J. B. RAMEY."

Thereupon Ramey took charge of the mine and operated it from May 1 to November 20, 1922. On August 30, 1922, Simpson conveyed his undivided half interest in the land to appellees, B. J. Ward and J. C. Charles, together with "all of his interest in the amounts owing to him by reason of the sale of the coal from this tract of land" to Ramey.

On February 8, 1923, Ward and Charles instituted this action against Ramey and Powell to recover the sum of $1,383.74 alleged to be due them from Ramey under his lease contract *supra* insofar as same had been executed and to have it declared unilateral, void and unenforceable except as already executed and to recover possession of the land. The answer and counterclaim of Ramey and Powell, in addition to denying that the former was indebted to plaintiffs as alleged or at all, or that his lease contract was unilateral or void, alleged that by it he became the owner of Simpson's half interest in the coal; that the only interest Simpson had in the coal or conveyed to plaintiffs was his one-half of the retained royalty of 5c per ton on all coal that Ramey sold for more than $3.00 a ton; that Ramey had already overpaid plaintiffs therefor; and for such overpayment, the amount of which was not alleged, judgment was prayed against plaintiffs.

A reply completed the issues and upon motion of plaintiffs the cause was referred to the master commissioner without objection "to take and state an account herein." Proof was taken and the master reported that for coal taken from the land by Ramey under his lease contract he was indebted to plaintiffs in the sum of $1,-383.74. Defendants filed exceptions to the commissioner's report, which were overruled and judgment entered in accordance with the report, and in addition declaring the contract unilateral and not enforceable except as already executed.

There is no substantial contradiction in the evidence as to the amount of coal taken from the land by Ramey, but the parties differ widely as to the amount due therefor under the contract. Appellees contend that under it their vendor, Simpson, was entitled not only to one-half of the royalty of 5c a ton on all coal produced and sold for $3.00 or more a ton, but also one-fourth of the net profits derived from Ramey's operation of the mine. If this be true then the judgment of $1,383.74 in their favor against Ramey is fully sustained by the evidence; but if, as contended by appellants, Simpson was entitled only to one-half of the royalty, then Ramey has, as he contends, overpaid plaintiffs by more than a thousand dollars. Hence the whole controversy hinges upon the proper construction of the contract.

While the contract is somewhat involved we think it is fairly clear from its terms that instead of conveying to Ramey Simpson's half interest in the coal for a half interest in the stipulated royalty, it was a joint lease by Powell and Simpson to Ramey of the privilege of mining the coal and that Simpson was entitled thereunder not only to one-half of the royalty but one-fourth of the net profits upon all the coal mined by Ramey. But even if it might be admitted that upon the latter question the contract is ambiguous the construction placed upon it by the parties themselves prior to the institution of this action is controlling and shows clearly that it was understood by them as a joint lease by Powell and Simpson rather than a conveyance by the latter, and that appellees, as Simpson's grantees, are entitled to one-fourth of the net profits as well as one-half of the royalty.

That this is true is conclusively established by the fact that on October 1 there was a settlement between Ramey and plaintiffs whereby it was ascertained that he then owed them $2,157.72 and that Ramey has paid them in accordance therewith $1,350.00. That this settlement included profits as well as royalties is clear from the fact that Ramey is now claiming that the total royalty due plaintiffs amounts to only $168.45. Extending this settlement so as to include the coal mined and sold in October and November brings the amount due plaintiffs up to the $1,383.74, for which they were given judgment. Practically the same figures are produced by taking the evidence of Mr. Moore, who was Ramey's bookkeeper, and including therein the $1,909.87 which Ramey claims to have expended in getting ready to operate the mine.

Hence this latter sum must have been included in the settlement of October 1 between Ramey and plaintiffs above referred to, and there is no merit in the contention for appellants that it was not taken into account in ascertaining the net amount due appellees. We are therefore clearly of the opinion that the judgment correctly construes the contract and adjudges the accounts between Ramey and plaintiffs thereunder.

This brings us to a consideration of whether or not the court erred in holding the contract unilateral and unenforceable by Ramey except as already executed. That the court did not err in so doing is we think clear.

It will be noticed that the contract does not obligate Ramey to operate the mine at all but gives him the privilege of doing so so long as he can make a profit on the coal and reserves to him the absolute right of terminating the contract at any time upon the sole condition of giving five days' notice thereof.

With reference to a mining contract not essentially different from this one, this court in Killebrew, et al. v. Murray, 151 Ky. 345, 151 S. W. 662, said:

"But whether it be denominated an executed or an executory contract, it is manifestly lacking in mutuality. It obligates the lessor, in unequivocal language, to continue the lease for 10 years, all the while holding the leased premises in readiness for the lessee's mining operations, but gives her no right to terminate the lease, to compel the lessees to begin mining the land, or to continue the work, if abandoned, after being commenced. On the other hand, the lease does not bind the lessees to do anything. It permits them to begin the work of mining phosphate on the leased premises at any time, within 10 years, that may be selected by them; to quit when they choose, or not to begin at all; and also the right to terminate the lease at any time upon their mere *ipse dixit* that the land does not contain phosphate in 'paying quantities;' it being left to them alone to decide whether it is in quantity sufficient to make the mining thereof profitable to them.

"Reduced to its last analysis, this lease is but a unilateral executory contract, such as is in Berry v. Frisbie, etc., 120 Ky. 337, 86 S. W. 558, 27 Ky. L. R. 724, declared void, and in Young v. McIllhenny, 116 S. W. 728, held to be unenforceable."

The Killebrew case was cited with approval in Louisville Tobacco Warehouse Co. v. Zeigler, 196 Ky. 414, 244 S. W. 899, where many other like cases are considered and in which this peculiarly pertinent statement will be found:

> "And it is well settled that the reserve power in one of the parties to terminate the contract at any time according to his pleasure destroys its mutuality and renders all unexecuted portions of it ineffectual, which principle is expressed in 13 C. J. 337, thus: 'Where one party reserves an absolute right to cancel or terminate the contract at any time mutuality is absent, this rule being frequently applied to contracts of sale or for the performance of services.' "

Wherefore the judgment is affirmed.